## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SELECTIVE INSURANCE COMPANY OF AMERICA <br><br> Plaintiff, <br><br> v. <br><br> HERITAGE CONSTRUCTION COMPANIES, LLC, JAC & SONS INVESTMENTS, ANDREW P. CHRISTENSEN, JENNIFER A. CHRISTENSEN, <br><br> Defendant/Third-Party Plaintiffs <br><br> v. <br><br> PHILIP KEITHAHN and MINNESOTA MEDICAL UNIVERSITY, LLC <br><br> Third-Party Defendants | Civil No. 19-3174 (JRT/JFD) <br><br><br> **ORDER GRANTING THIRD PARTY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT IN PART AND DENYING IN PART** |

Anju Suresh & Russell S. Ponessa, **HINSHAW & CULBERTSON LLP**, 333 South Seventh Street, Suite 2000, Minneapolis, MN 55402; Richard B. Polony, **HINSHAW & CULBERTSON LLP**, 151 North Franklin Street, Suite 2500, Chicago, IL 60606, for plaintiff.

Kyle E. Hart & Richard G. Jensen, **FABYANSKE WESTRA HART & THOMSON, PA**, 333 South Seventh Street, Suite 2600, Minneapolis, MN 55402, for Defendant/Third-Party Plaintiffs.

J. Scott Andresen and Kyle Stephen Willems, **BASSFORD REMELE, PA**, 100 South Fifth Street, Suite 1500, Minneapolis, MN 55402, for Third-Party Defendants.

Plaintiff Selective Insurance Company of America ("Selective") brought this action against Defendants/Third-Party Plaintiffs, Heritage Construction Companies, LLC, JAC & Sons Investments, Andrew Christensen, and Jennifer Christensen (collectively the "Heritage Defendants") seeking to enforce an agreement between Selective and the

Heritage Defendants regarding a construction project. That construction project involved the renovation of a building for the Minnesota Medical University ("MMU"), a proposed osteopathic medical school in Gaylord, Minnesota. The Heritage Defendants had entered into a construction contract with MMU and, in order to proceed with that construction, had entered the agreement with Selective whereby Selective would provide bonds to the Heritage Defendants to ensure payment of subcontractors working on the construction. The construction project fell through and Selective had to pay a significant amount of money to the Heritage Defendants' subcontractors. Selective filed this cause of action to collect that owed amount. The Heritage Defendants answered Selective's Complaint and filed a Third-Party Complaint against MMU and its CFO, Philip Keithahn (collectively the "TPDs") asserting several claims including defense/indemnification/contribution, fraud/negligent misrepresentation, and promissory and/or equitable estoppel.

The TPDs have filed a partial motion for summary judgment seeking dismissal of the fraudulent/negligent misrepresentation claim and the duty to defend/contribution claims against MMU, as well as dismissal of all claims against Keithahn. Because the Heritage Defendants have pled their fraudulent/negligent misrepresentation claim with specificity and a genuine dispute of material fact remains as to those representations and/or omissions, the Court will deny the TPDs' motion on that claim. As to the claims of a duty to defend and contribution, the Heritage Defendants cannot properly argue that the TPDs are liable under either theory, and therefore, the Court will grant the TPDs'

motion on these claims.   The indemnification claim against Keithahn can survive, however, because genuine disputes remain as whether an underlying tort occurred. Lastly, the Court will grant the TPDs' motion for summary judgment on the promissory and/or equitable estoppel claims against Keithahn because, at all times, he was acting as a representative of MMU.

**BACKGROUND**

## I.      FACTUAL BACKGROUND

In 2017, Keithahn organized MMU for the purpose of developing an osteopathic medical school in Gaylord, Minnesota.  (Aff. Richard Jensen Opp. Mot. Summ. J., Ex. 1 ("Keithahn Dep.") at 9:10–17, Jan. 5, 2022, Docket No. 91.)  Keithahn, along with several others, invested a significant amount of their own personal money into MMU.  (Decl. Kyle S. Willems Supp. Mot. Partial Summ. J. ("Willems Decl."), Ex. 4 at Schedules 2–4, Dec. 15, 2021, Docket No. 84.)  The Heritage Defendants submitted a general contractor bid to MMU hoping to secure the renovation of the building where MMU would be located (the "Construction Project").  (Keithahn Dep. at 36:21–25; 37:1–7.)  The Heritage Defendants were hired, signing a written contract (the "Construction Contract") on November 29, 2018 with MMU.  (Willems Decl., Ex. 7.)  Over the course of the parties' relationship, Andrew Harvala represented the Heritage Defendants' interests.

The Construction Project would be financed by MMU through a combination of cash and bonds (the "Cash Bonds").  (Willems Decl., Ex. 6 at 2, 30.)  The Cash Bonds had

3

conditions to them—additional funds would be unlocked based on MMU taking steps toward accreditation with the Commission on Osteopathic College Accreditation ("COCA").[1]  (Willems Decl., Ex. 10 at § 5.03.)  Specifically, funding of the Cash Bonds was subject to MMU achieving pre-accreditation status with COCA by May 15, 2019.  (*Id.*)  If pre-accreditation was not achieved by that date, the financing of the Cash Bonds would be halted, but they would only be redeemed if MMU did not achieve pre-accreditation status before September 30, 2019.  (*Id.* at § 5.03(e).)  The parties dispute whether the Heritage Defendants had any knowledge of these conditions.

Once the Construction Contract was signed, but prior to the commencement of construction, the Heritage Defendants had to obtain their own bonds (the "Payment Bonds") to ensure payment obligations could be met to suppliers and subcontractors. (Willems Decl., Ex. 23 at § 3.4(n).)  The Payment Bonds were secured from Selective. (Decl. Jonathan Panico Supp. Mot. Summ. J., Exs. B–C, Dec. 15, 2021, Docket No. 77.)  As a precondition to the issuance of the Payment Bonds, the Heritage Defendants entered into a General Agreement of Indemnity ("GAI") with Selective in January 2019, wherein they agreed not only to indemnify Selective for any losses sustained but also to provide collateral security to Selective upon demand.  (Panic Decl., Ex. A at §§ 3–4.)

---

[1] The COCA is the organization which accredits osteopathic schools in the United States. *Comm'n on Osteopathic College Accreditation*, Am. Osteopathic Ass'n, available at https://osteopathic.org/accreditation/.

After signing the GAI, the Heritage Defendants performed approximately $200,000 worth of construction management and demolition work on the Construction Project. (Willems Decl., Ex. 40.)  The Heritage Defendants then suspended construction pending the availability of construction financing which was scheduled to close in April 2019.  On April 10, 2019, the Heritage Defendants were notified via email that the Cash Bonds were closed and renovations could begin.  (Willems Decl., Exs. 14, 24.)  Keithahn asserts that prior to the closing of the Cash Bonds, he was informed by his investment banking firm that MMU had a little over $7 million upon closing to finance the construction through August 2019.  (Keithahn Decl. ¶ 6; Keithahn Decl., Ex. 1.)

One requirement of pre-accreditation with COCA is to fully fund an escrow account with $37.5 million.  (Willems Decl., Exs. 18, 21, 22.)  This requirement was one of the reasons fueling the need for the Cash Bonds because the Cash Bonds placed $33.8 million into that escrow account.  (Willems Decl., Ex. 21.)  MMU had to provide $3.7 million of its investor capital to the escrow account in order for it to be considered fully funded.  (*Id.*) Keithahn claims that the TPDs believed the movement of $3.7 million in investor capital into the COCA escrow account would not impact the $7 million available for construction. (Keithahn Decl. ¶ 8.)

The Heritage Defendants claim that the TPDs made several fraudulent statements regarding the availability of construction financing prior to the pre-accreditation COCA meeting in April 2019.  First, in an Investor Presentation dated January 1, 2019, presented

5

to the Heritage Defendants, MMU stated it had "ample liquidity for construction and operating contingencies." (Willems Decl., Ex. 6.) Keithahn admits that he intended this statement to communicate MMU had ready access to funds for construction. (Keithahn Dep. at 95:3–12.) Next, Andrew Christensen, owner of Heritage, asserts that, prior to the signing of the GAI, he communicated concerns to Keithahn about the risk the Construction Project posed to his company. (Aff. Andrew Christensen Opp. Mot. Summ. J. ¶ 8, Jan. 5, 2022, Docket No. 89.) Christensen states that he called Keithahn to express these concerns and to confirm that once construction starts, the financing would be there. (*Id.*) Keithahn allegedly provided assurances and stated that the financing would, in fact, be there. (*Id.*) Heritage's representative, Harvala, claims he held similar sentiments as Christensen and asserts that he expressed these concerns to Keithahn in February 2019. (Aff. Andrew Harvala Opp. Mot. Summ. J. ¶ 9, Jan. 5, 2022, Docket No. 90.) In response, Keithahn allegedly promised to set aside $7 million dedicated solely to pay for construction work through August 2019. (*Id.* ¶ 11.)

The Heritage Defendants claim that several documents in the record confirm these alleged misrepresentations or omissions took place. On February 20, 2019, Keithahn sent an email to Harvala stating that he was working on the "cash flow budget with the financing" and discussed the $7 million needed for the first three months of construction. (Harvala Decl., Ex. 1.) On March 26, 2019, Keithahn sent an email to several people, including Christensen, stating that MMU had received "signed commitments from

6

investors who have purchased all of the financing for the construction and operation of the medical school." (Christensen Decl., Ex. 3.) On April 3, 2019, Keithahn sent an email to Harvala stating that he was "confident that [MMU has] now satisfied all of the conditions necessary to close on the financing." (Harvala Decl., Ex. 2.) And on April 10, 2019, Keithahn communicated to the Heritage Defendants that the financing for construction and operations had closed. (Christensen Decl., Ex. 4.)

Furthermore, Harvala states that shortly before construction began, Keithahn confirmed to him again that the $7 million had been set aside for construction financing which would pay for work done through August 2019. (Harvala Decl., ¶ 16.) Michael Montag, a co-investor of MMU, asserts that he shared a similar understanding that $7 million had been set aside for construction. (Jensen Decl., Ex. 3 ("Montag Dep.") at 37:22–38:2, 41:8–17.)[2] Neither party has pointed the Court to any record evidence that shows $7 million was actually set aside.

MMU planned to seek pre-accreditation status at the April 26, 2019 meeting of the COCA board of commissioners. (Willems Decl., Ex. 22.) Pre-accreditation status was not guaranteed and if it was not granted in April 2019, MMU would be able to apply again in August 2019. (Jensen Decl., Ex. 9.) MMU presented to the COCA board of commissions

---

[2] The Court understands that the TPDs question the motivations behind Montag's statements, but this is ultimately an issue of credibility. Credibility of a witness is not appropriate for the Court to consider on a summary judgment motion. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (A court does "not weigh the evidence or attempt to determine the credibility of the witnesses.").

at the April 26, 2019 meeting but were notified soon thereafter, on or before May 3, that MMU would not be granted pre-accreditation and that it should reapply in August. (Keithahn Dep. at 122:21–123:6; Jensen Decl., Ex. 8.)  On May 12, 2019, MMU withdrew its application from COCA.  (Keithahn Dep. at 49:10–17.)

On May 4, 2019, Keithahn claims that MMU learned for the first time that the $3.7 million it originally deposited into the COCA escrow account was deducted from the amount of funds available for construction.  (Keithahn Decl. ¶ 9.)  On that same day, Keithahn sent an email to other MMU co-governors stating that "[w]e still need $6.5 million in additional funding to cover construction payments for the months of June, July, August, and September."  (Jensen Decl., Ex. 10.)  Keithahn asserts that the MMU board still believed, upon learning of the escrow account issue, that the summer construction could be funded as three large outside investors had previously expressed interest in funding MMU.  (Keithahn Decl. ¶ 10.)

The Heritage Defendants continued with the construction work.  On May 3, 2019, Keithahn sent an email copying Harvala and attaching a document that confirmed construction could commence.  (Jensen Decl., Ex. 12.)  The email failed to mention that MMU was no longer applying for pre-accreditation status in April or that the construction financing would be affected.  On May 22, 2019, Harvala sent an email to Keithahn referencing "investor options" to finance construction funds for work occurring after the

summer.  (Harvala Decl. ¶ 20; Harvala Decl., Ex. 4.)  Keithahn responded that he would call Harvala later that day, but Harvala states Keithahn never responded.  (*Id.*)

On June 6, 2019, Harvala claims to have had a conversation with Montag regarding a third payment from MMU which had yet to be remitted.  (Harvala Decl. ¶ 21.)  Harvala states that during that conversation, Montag called Keithahn and Keithahn represented to Montag that the payment would be distributed to the Heritage Defendants by June 14, 2019.  (*Id.*)  Keithahn did not mention that the financing had been suspended.

On June 10, 2019, MMU sent a formal notice to its investors, including Christensen, that MMU had limited access to construction funds as a result of the withdrawal of their application with COCA.  (Willems Decl., Ex. 13.)  Harvala claims that he did not interpret MMU's notice as stating that MMU had no money to pay for the ongoing construction, but rather, that the limitation was related to funding for construction work outside of the initial $7 million allegedly set aside for the summer.  (Harvala Decl. ¶ 18.)  On June 12, 2019, Harvala sent an email to Keithahn asking him to confirm whether the amounts to be paid to the Heritage Defendants for work done over the summer months was already secured or whether they were "dependent on an investor."  (Havarla Decl., Ex. 6.)  Keithahn did not respond to that email.

On June 20, 2019, Keithahn sent an email to Harvala stating that the third payment to Heritage was "in process."  (Harvala Decl., Ex. 7.)  On June 21, 2019, Harvala sent an email to Keithahn and Montag reiterating his understanding that MMU claimed they had

enough money to cover this third payment and that the payment was supposed to come into their hands by June 14.  (Harvala Decl., Ex. 5.)  Harvala noted, in that email, that payment had yet to be remitted to the Heritage Defendants, and Harvala also stated that absent a resolution on the construction finances, the construction would need to stop. (*Id.*)

The Heritage Defendants continued construction work until the end of June 2019. (Harvala Dep. at 100:24–101:6.)  On July 9, 2019, the Heritage Defendants sent a formal notice of their suspension of work and laid out its claims for payment.  (Harvala Decl., Ex. 8.)  On July 31, 2019, Christensen sent an email to Keithahn stating that July 31 was the date MMU promised Heritage it would receive payment for the first of three unpaid installments that were supposed to "have already been paid by the funds you had promised us at the start of the project."  (Christensen Decl., Ex. 5.)  A formal notice was sent to MMU on August 5, 2019, terminating the contract with MMU.  (Willems Decl., Ex. 38.)

Heritage could not pay its subcontractors for the work done on the Construction Project and Selective, because of the Payment Bonds, had to step in to pay those subcontractors over $3 million.  (Panico Decl. ¶¶ 3–4.)  On December 20, 2019, Selective made a demand to Heritage to indemnify them for those costs and to post collateral in the amount of $2.5 million.  (Panico Decl. ¶ 5; Panico Decl., Ex. 3; Compl. ¶¶ 25–26.)

Heritage failed to indemnify Selective or to remit the collateral in violation of the GAI. (Compl. ¶ 27.)

## II.     PROCEDURAL HISTORY

On December 27, 2019, Selective commenced this action against the Heritage Defendants bringing claims for indemnity, common law indemnity, breach of contract, and specific performance all arising from the Heritage Defendants' failure to indemnify and remit collateral security pursuant to the GAI.  (Compl.)  The Heritage Defendants answered the Complaint and filed its own Third-Party Complaint against Keithahn and MMU. (Ans., Third Party Compl., Feb. 20, 2020, Docket No. 14.)  The Heritage Defendants and Selective have reached a confidential settlement agreement.  (Notice/Ltr Withdrawal Selective Mot. Summ. J., May 6, 2022, Docket No. 103.)

In their Third-Party Complaint, the Heritage Defendants asserted claims of defense/indemnification/contribution, fraud/negligent misrepresentation, promissory and/or equitable estoppel, quantum meruit/unjust enrichment, aiding & abetting, and civil conspiracy against the TPDs.  (*Id.*)   The Heritage Defendants have since dismissed their claims for conspiracy, aiding & abetting, and quantum meruit/unjust enrichment. (Notice of Dismissal, May 27, 2022, Docket No. 106.)  JAC and the Christensens have dismissed all their claims against the TPDs except for the common law indemnification claim.  (*Id.*)  Heritage dismissed its equitable claims against MMU.  (*Id.*)

The TPDs filed a motion for partial summary judgment seeking dismissal of all claims against Keithahn and dismissal of the fraudulent/negligent misrepresentation and defense/contribution claims against MMU.  (TPD's Mot. Partial Summ. J., Dec. 15, 2021, Docket No. 80.)

## DISCUSSION

### I.    STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

II.     **ANALYSIS**

The TPDs have brought a partial motion for summary judgment asking that the Court dismiss all claims against Keithahn and all claims against MMU except the breach of contract and indemnity claims.

### A.  Fraudulent/Negligent Misrepresentation Claim

The TPDs raised several arguments in support of their assertion that the fraudulent/negligent misrepresentation claim should be dismissed.  The Court addresses each in turn.

### 1.  Procedural Argument - Rule 9(b)

The TPDs first argue that the fraudulent/negligent misrepresentation claim should be dismissed because the Third-Party Complaint failed to plead those claims with specificity as required by Federal Rules of Civil Procedure Rule 9(b).  Rule 9(b) states that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "[T]he complaint must allege such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Podpeskar v. Makita USA Inc.*, 247 F. Supp. 3d 1001, 1010 (D. Minn. 2017).  In other words, a plaintiff must "typically identify the  who, what, where, when, and how of the alleged fraud." *Id.*

The purpose of Rule 9(b) is to facilitate a defendant's response and assist in preparing their defense. *Com. Prop. Investments, Inc. v. Quality Inns Intern., Inc.*, 61 F.3d 639, 646 (8th Cir. 1995). This rule should be interpreted "in harmony with the principles of notice pleading." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001). Furthermore, Rule 9(b) "simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case[.]" *Id.*

While true that the Court is able to grant summary judgment on Rule 9(b) grounds, the Court declines to do so here. The TPDs rely heavily on *Thayer v. Planned Parenthood of the Hearthland, Inc.*, to support their argument that dismissal due to failure to comply with Rule 9(b) would be appropriate. 11 F.4th 934 (8th Cir. 2021). But *Thayer* is distinguishable. There, the Eighth Circuit held that Rule 9(b) was not met because the plaintiff was pursuing an argument distinct from the one presented in the original complaint. *Id.* at 939–40. Because a new theory was presented, the defendant was deprived of the opportunity to be placed on notice and prepare for that theory. *Id.*

But here, the TPDs cannot claim that the Heritage Defendants have presented a new legal theory at summary judgment. The TPDs assert that the Heritage Defendants changed their legal theory from one regarding affirmative misrepresentations to one based upon fraudulent omissions. They claim they were never notified of a fraud by omission claim until the Heritage Defendants' summary judgment brief because it was never listed as a separate count in the Third-Party Complaint and the Third-Party

14

Complaint did not use the word "omission."  The Court is unpersuaded by these arguments.  While the Heritage Defendants did not use the specific word "omission" in the Third-Party Complaint, they made several statements that would put the TPDs on notice of the Heritage Defendants' intent to pursue a fraudulent omission claim.  For example, the Third-Party Complaint clearly states that "Keithahn failed to disclose that [there was no financing] . . . despite an affirmative obligation to do so" and that such failure "constitutes an additional misrepresentation."  (Third Party Compl. ¶ 23.)  The Court finds it hard to construe this allegation as anything other than a claim for fraud by omission.

The TPDs have chosen to pursue a Rule 9(b) argument at the close of discovery, when the contours of the case have been mapped out and the details drilled down.[3]  The fact that not only were the TPDs able to answer the Third-Party Complaint but the litigation has proceeded through the end of discovery demonstrates that the TPDs were able to reasonably respond and prepare a defense.  Notice pleading principles do not necessitate a different conclusion.  Thus, the TPDs' challenge to the Third-Party Complaint based upon Rule 9(b) is untimely and unpersuasive.[4]

---

[3] The TPDs point to the fact that they raised a Rule 9(b) challenge in their Answer.  To be clear, the TPDs mentioned Rule 9(b) briefly in their Answer as a potential affirmative defense but did not develop the argument until this motion.

[4] The TPDs further assert that the Third-Party Complaint fails under Rule 10(b) because it did not include Fraud by Omission as a separate cause of action.  Rule 10(b) states that "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count[.]"  Fed. R. Civ. P. 10(b).  The Third-Party Complaint was sufficiently clear on the causes of action and the types of legal theories the Heritage Defendants would

### 2. Substantive Argument

To succeed on a claim for fraudulent misrepresentation a party must prove: (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance; and (5) the party suffered damages. *Hoyt Prop., Inc. v. Prod. Res. Grp.*, 736 N.W.2d 33, 318 (Minn. 2007).[5]

To prove a claim for fraud by omission, a party must show: (1) the defendant omitted a past or present material fact unknown to plaintiff and that the defendant was under a duty to disclose; (2) the defendant intended for plaintiff to rely on the omission; (3) plaintiff did rely; and (4) damages. *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986). A party has a duty to disclose information when a "special circumstance" exists such as: (1) when omission would mislead the other party; (2) when the party has special knowledge to which the other party does not have access; or (3) when one party stands in a confidential or fiduciary relationship to the other. *Richfield Bank & Trust v. Sjorgren*, 244 N.W.2d 648, 650 (Minn. 1976).

---

pursue, including fraud by omission. The TPDs' flawed reading of the rule would, in fact, result in more confusion as requiring the pleadings to lay out any fraudulent or negligent misrepresentation made affirmatively or by omission, would result in a lengthy and convoluted complaint.

[5] The elements of negligent misrepresentation differ only with respect to the required state of mind. *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010).

i.     **Statements Regarding Construction Financing**

The TPDs claim that any statement made by Keithahn or MMU that there was any amount of money dedicated to construction financing, or specifically that $7 million had been set aside, cannot form the basis of a fraudulent/negligent misrepresentation claim because the statements were true when made. *Hoyt Prop.,* 736 N.W.2d at 318 (stating that a false representation is an element of fraudulent misrepresentation claims).

The Court notes two initial matters. First, the TPDs' motion for partial summary judgment solely addresses the statements identified in the Third-Party Complaint. The TPDs fail to refute the additional misrepresentations identified during discovery and meaningfully engage with the evidence of such statements in their briefs. Second, the TPDs claim that Heritage has improperly relied upon self-serving affidavits to manufacture a genuine issue of material fact. While Heritage does point to affidavits submitted by witnesses, the statements made in those affidavits are bolstered by other record evidence. For example, Christensen stated not only in his affidavit but also in his deposition testimony that he talked to Keithahn about ensuring the financing was "solid and secure." (Willems Decl., Ex. 32 at 50:19–51:7.) Furthermore, there are emails and investor presentations in the record that can form the basis for a genuine issue of material fact. (*See, e.g.*, Harvala Decl., Ex. 4; Willems Decl., Ex. 6.) While witness testimony certainly constitutes a substantial portion of the Heritage Defendants' evidence regarding

fraudulent/negligent misrepresentation, that testimony is rooted in record evidence and is not derived solely from self-serving affidavits.

As to the claim itself, a genuine dispute remains. Though the TPDs assert that any statement made by Keithahn was true at the time it was made, the TPDs have not provided indisputable evidence that shows that there were specific funds designated for construction financing. Nor have they shown that any amount of money was set aside specifically for construction.

Furthermore, Heritage alleges that after Keithahn and MMU knew the construction financing was impacted by the pre-accreditation contingencies, Keithahn continued to make alleged misrepresentations regarding the availability of financing.[6] Regardless of the veracity of these allegations, the nature of Heritage's claims come down to the credibility of the individuals involved in the conversations. The TPDs cannot incontrovertibly show that any of the alleged statements made by Keithahn were true. Thus, the case boils down to the credibility of the witness statements, the reasonableness of witnesses' interpretations of conversations, emails, documents etc., and Keithahn's

---

[6] The TPDs assert that Heritage was made aware of the financing constraints by at least June 10, 2019, through MMU's formal notice to the investors. (Willems Decl., Ex. 13.) But as discussed above, a genuine dispute exists as to whether the letter properly informed Heritage of the constraints on financing for the summer months as Harvala claims that he understood the letter as indicating that there would be issues with financing only after August 2019. (Harvala Decl. ¶ 18.) And Heritage points to other pieces of record evidence to support their assertion that, at all times, it believed financing was available for at least the summer months of 2019 after learning that pre-accreditation did not occur in April 2019.

state of mind when making the alleged misrepresentations.  These are determinations best suited for a jury.

Heritage has identified sufficient record evidence, including but not limited to witness testimony, that demonstrates a genuine issue of material fact remains on the fraudulent/negligent misrepresentation claim based upon affirmative statements made by the TPDs.  As such, the Court will deny the TPDs' motion for partial summary judgment as to the fraudulent/negligent misrepresentation claim based upon the affirmative statements made by Keithahn.

### ii.      Omission of Financing Conditions

A genuine dispute of material fact remains on the fraud by omission claim as well. Heritage claims that even if Keithahn's affirmative statements were not, for whatever reason, fraudulent/negligent misrepresentations, they constitute fraudulent omissions. Heritage asserts it is undisputed Keithahn was aware that the construction funding was subject to the May 15 pre-accreditation contingency and yet he continued to represent to Heritage that MMU had unrestricted access to construction financing for the summer months of 2019.  And after MMU failed to obtain COCA pre-accreditation in April 2019, resulting in the suspension of any bond financing, Keithahn continued to represent that Heritage would get paid for summer construction work, omitting the fact that the financing had fallen through.  Heritage claims that Keithahn not only omitted this material information but that he had a duty to disclose it.

The TPDs disagree, asserting that they never misled Heritage as they never represented that there was construction funding in place to begin with. As discussed above, a genuine issue of material fact remains as to whether the TPDs made any such statements. Furthermore, this legal theory is dependent upon whether the Heritage Defendants knew about the financing contingencies and when. The parties dispute the witness's knowledge of the contingencies, resulting in again, a classic he-said, he-said. The determination of who is telling the truth is not something for this Court to decide but rather should be put before a jury.

The TPDs further contest any claim of fraud by omission because, they argue, it is undisputed that Keithahn never had a duty to disclose information to Heritage. A party has a duty to disclose information when a "special circumstance" exists such as: (1) when omission would mislead the other party; (2) when the party has special knowledge to which the other party does not have access; or (3) when one party stands in a confidential or fiduciary relationship to the other. *Richfield Bank & Trust*, 244 N.W.2d at 650.

Heritage claims that Keithahn did have a duty to disclose because: (1) failure to disclose made the representation misleading; (2) the financing contingencies constituted special knowledge of material facts that only Keithahn had access to; and (3) Keithahn had a confidential and/or fiduciary relationship with Heritage because Christensen, the owner of Heritage, was a member of MMU and Keithahn was on the board of MMU. As to Heritage's first point, there exists a genuine dispute of material fact as to whether

failure to disclose made the representation misleading.  Testimony from witnesses indicates that Heritage had a different understanding of the impact of the financing issues on the funding for summer construction work.  So, failure to fully disclose could potentially have made Keithahn's representations misleading depending on what the witnesses truly knew.  Again, this is a witness credibility issue.

Heritage's knowledge or lack thereof of the financing contingencies is relevant. Though Heritage may have had access to the bond documents because they were publicly available and theoretically it could have discovered the financing contingencies, the existence of the contingencies is not the special knowledge at issue.  Rather it is the special knowledge of the impact the failure to achieve pre-accreditation had on the funding available for construction for the 2019 summer months.  Heritage claims that even after it was informed that the Cash Bonds were suspended due to MMU's failure to be pre-accredited, it still believed there was funding for construction through the summer.  Heritage asserts that it did not understand how that contingency impacted the construction financing, but Keithahn did.  Omissions regarding material facts on how a specific event impacts a party can form the basis of a valid fraud by omission claim. *Com. Prop. Invest, Inc. v. Quality Inns. Int'l, Inc.*, 938 F.2d 870, 877 (8th Cir. 1991).  The impact of the failure to achieve pre-accreditation on the availability of the summer construction funds constitutes special knowledge.  Thus, again, whether Keithahn made these

statements and what Heritage actually knew are fact questions for the jury, not questions that can be resolved at summary judgment.

Heritage asserts that Keithahn owed fiduciary duties to Christensen, who is the owner of Heritage, because Christensen was a member of MMU. *See* Minn. Stat. 322C.409, Subd. 8.   But Heritage alone is the party asserting claims of fraudulent/negligent misrepresentation against the TPDs.   (Notice Dismissal at ¶ 1.) Christensen was the member of MMU, so any fiduciary duties were owed to him, not Heritage.   And because Heritage is the only party asserting that Keithahn had a duty to disclose and that failure constitutes a fraud by omission, Heritage must show that Keithahn owed it a fiduciary duty.   Heritage has not done so here.   The Court is unpersuaded by Heritage's claims that Keithahn had a duty to disclose because he stood in a confidential or fiduciary relationship with Heritage.

In sum, Heritage has demonstrated that a genuine dispute of material fact remains as to whether the TPDs committed a fraud by omission.   Genuine disputes remain as to what statements were made to the parties, what information was left out, and what each witness knew during the relevant conversations.   Additionally, genuine disputes remain as to whether Keithahn owed a duty to disclose to Heritage.   As such, the fraud by omission theory survives summary judgment as well.

### iii.   Reliance

22

The TPDs claim that Heritage's fraudulent/negligent misrepresentation claims fail because it has failed to prove the element of reliance. One element of the tort is that the representation must cause the other party to act in reliance upon it. *Hoyt Prop., Inc.*, 736 N.W.2d at 318. The TPDs assert Heritage has not demonstrated reliance because their damages flow from the Construction Contract, which was entered into in November 2018, and the GAI, which was entered into in January 2019. The TPDS claim that the alleged misrepresentations or omissions, though, occurred after Heritage signed these contracts so therefore, they did not act in reliance on any misrepresentation or omission when entering into those contracts.

First, there is a genuine dispute of fact as to whether Keithahn made any representations to Christensen prior to signing the GAI. [7] Whether this statement was made or not is determined by credibility assessments. Second, and more importantly, Heritage does not argue that its reliance derives solely from signing the contracts. Rather, Heritage argues that it relied on Keithahn's misrepresentations to continue its

---

[7] The TPDs also argue that the statement from Keithahn to Christensen in early January 2019, prior to signing the GAI, stating that once the bond transaction closed "nothing could stop the financing" cannot constitute the basis for fraud because "fraud requires a misrepresentation concerning a past or present material fact susceptible to knowledge, statements of prediction, opinion, or 'puffery' cannot form the basis of a fraud claim." *Moua*, 810 F. Supp. 2d at 890. The TPDs argue that Keithahn's statement related to financing that was contingent on the closing, which had yet to occur. The Court does not agree. Keithahn's statement was not a prediction, opinion or puffery. Perhaps if Heritage was relying on Keithahn's statement to assume that the bond financing would **close**, his statement could be perceived as a prediction. But Keithahn was talking about what would happen once the bond financing closed, if it ever did, informing Christensen that there would be no contingencies on that financing. This was not a prediction or an opinion but was based on his knowledge of the present material terms of the transaction.

23

construction work through the end of June, under the assumption that funding was in place. The fact that many of the alleged misrepresentations and omissions occurred after Heritage signed the Construction Contract and the GAI does not mandate a finding on summary judgment in the TPDs' favor.

### iv.   Fraudulent/Negligent Misrepresentation Claim Against Keithahn

The TPDs claim that Keithahn cannot be held personally liable for actions undertaken as the corporate representative of MMU. *Ransom v. FFS, Inc.*, 918 F. Supp. 2d 888, 894 (D. Minn. 2013) ("An officer and shareholder of a corporation cannot be held personally liable for the obligations of the corporation except in limited circumstances."). An officer can be held liable when the officer has participated in the misdeeds of the corporation. *Ellingson v. World Amusement Serv. Ass'n*, 222 N.W. 335, 339 (Minn. 1928). An officer who takes part in the commission of a tort is personally liable, therefore. *Id*. As a genuine dispute of material fact remains on the fraudulent/negligent misrepresentation claim, Keithahn could still be held liable. Thus, the Court will deny the TPDs' motion for partial summary judgment on the fraudulent/negligent misrepresentation claim against Keithahn.

## B.   Defense/Indemnification/Contribution

The TPDs ask the Court to dismiss the Defense/Indemnification/Contribution claim against Keithahn and to dismiss the legal theories of defense and contribution against MMU. The Court considers each in turn.

### 1.  Duty to Defend

The TPDs state that there is no duty to defend because there is no contractual duty to defend.  "[I]f there is no contract to defend, there is no duty to defend."  *RBC Dain Rauscher, Inc. v. Fed. Ins. Co.*, 2003 WL 25836278, at *3 (D. Minn. Dec. 2, 2003).  The Heritage Defendants have pointed to no contract that requires the TPDs to defend it as the only operative contract between the parties, Construction Contract, contains no such provision.  Nor have the Heritage Defendants pointed the Court to any case law which has held the duty to defend exists absent a contract.  Thus, the Court will grant the TPDs' motion for partial summary judgment on the Heritage Defendants' duty to defend claim against the TPDs.

### 2.  Contribution

"In Minnesota, a party suing for contribution must satisfy two threshold requirements: (1) the parties must share a common liability or burden, and (2) the party suing for contribution must have discharged more than his fair share of the common liability or burden."  *All Metro Glass Inc. v. Tubelite, Inc.*, 227 F. Supp. 3d 1007, 1013 (D. Minn. 2016).  Minnesota courts have explained that "common liability" exists where two parties are liable to a plaintiff for the same damages, even if that liability depends on different legal theories.  *City of Willmar v. Short-Elliot-Hendrickson, Inc.*, 512 N.W.2d 872, 874 (Minn. 1994).  "It is well established that it is joint [l]iability, rather than joint or

concurring [n]egligence, which determines the right of contribution." *Spitzak v. Schumacher*, 241 N.W.2d 641, 645 n.2 (Minn. 1976).

The Heritage Defendants claim that since Selective is seeking to recover a certain amount owed to it under the GAI and the Heritage Defendants are seeking that same amount from the TPDs as damages, a contribution claim is appropriate. The Heritage Defendants misunderstand the concept of contribution. Contribution allows for a situation where two parties are liable **to the same plaintiff** for the **same damages** under different legal theories. This is not the case here. The TPDs may be liable to the Heritage Defendants for damages incurred as a result of the TPDs committing a tort. The damages arose because the Heritage Defendants were unable to pay their subcontractors. But the TPDs are not liable to Selective for any amount owed under any legal theory. The TPDs committed no tort against Selective and have no contract with Selective. Put another way, Selective could not have sued the TPDs instead of the Heritage Defendants for the amount they are owed under the GAI. The Heritage Defendants alone are liable to Selective. Thus, the Court will grant the TPDs' motion for summary judgment on the Heritage Defendants' contribution claim against the TPDs.

### 3. Indemnity

The TPDs seek dismissal of the indemnity claim against Keithahn. "A right of indemnity arises when a party seeking indemnity has incurred liability due to a breach of a duty owed to it by the one sought to be charged." *In re RFC & RESCAP Liquidating Tr.*

*Action*, 332 F. Supp. 3d 1101, 1128–29 (D. Minn. 2018).  The only relevant duty here would

be a tort duty.  Since the Court has found that a genuine dispute of material fact remains

on the tort claim—fraudulent/negligent misrepresentation—Keithahn could be held

liable under the common law theory of indemnity because he allegedly engaged in a tort.

Thus, the Court will deny the TPDs' motion for partial summary judgment on the common

law indemnity claim against Keithahn.

### C.  Promissory and Equitable Estoppel

The TPDs request that the two equitable claims against Keithahn be dismissed

because the claims are deficient.  The elements of promissory estoppel require: (1) a clear

and definite promise; (2) the promisor intended to induce reliance and the promisee in

fact relied to his or her detriment; and (3) the promise must be enforced to prevent

injustice.  *Martens v. Minn. Min. & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000).  The

elements for equitable estoppel are analogous.  *EEP Workers' Comp. Fund v. Fun & Sun,*

*Inc.*, 794 N.W.2d 126, 134–35 (Minn. Ct. App. 2011).

The equitable claims against Keithahn fail because all parties understood that

Keithahn was acting as the representative of MMU.  In general, an officer of a corporation

is not liable to its creditors for corporate debts."  *Haas v. Harris*, 347 N.W.2d 838, 840

(Minn. Ct. App. 1984).[8]  The principals of agency law will apply when assessing whether

---

[8] At first blush, this rule may seem contrary to the discussion above stating that Keithahn can be personally liable for any tort committed by MMU.  But, holding an officer liable under a theory of promissory or equitable estoppel is distinct form holding an officer liable for commission of a tort.

an officer may be held personally liable. *Paynesville Farmers Union Oil Co. v. Ever Ready Oil Co.*, 379 N.W.2d 186, 188 (Minn. Ct. App. 1995). When an agent acts for a partially disclosed or undisclosed principal, the agent is a party to the agreement and liable. *Id.* Here, however, the principal was fully disclosed and therefore, Keithahn would not be liable on any contract or obligation. Thus, the Court will grant the TPDs' partial motion for summary judgment on the promissory and equitable estoppel claims against Keithahn.

## ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Third-Party Defendants' Motion for Partial Summary Judgment [Docket No. 80] is **GRANTED in part and DENIED in part** as follows:

   a. **GRANTED in part** on Count I, the claims of defense and contribution are dismissed;

   b. **GRANTED** as to Count III;

   c. **DENIED** as to the remaining Counts.

DATED: September 7, 2022
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court

28